# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JANE DOE,

       *Plaintiff*,

    v.

DISTRICT OF COLUMBIA, *et al.*,

       *Defendants*.

Civil Action No. 13-878 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

The plaintiff in this case, known here by the pseudonym Jane Doe, is a young transgender woman who served a sentence in District of Columbia jail. She had a feminine appearance and, due to ongoing hormone therapy, had developed breasts. On the night of July 17, 2012, for reasons not apparent from the record, two prison guards placed her in the same cell as another inmate, Leonard Johnson. Doe protested that she was on "house alone" status, but the guards locked Johnson in her cell regardless. They left Johnson there until morning. Security footage shows that, with perhaps one exception, no guard visually checked on Doe's cell until the next shift arrived the following morning. By then, Johnson had raped Doe twice. This was the second time in eight months that guards improperly transferred Johnson into the cell of another prisoner whom Johnson allegedly raped.

Doe filed suit against the two guards—Lieutenant Robert Gladden and Corporal Longinus Ogu—and against four other guards on duty that night, as well as against the District of Columbia. She brings claims against all defendants for intentional infliction of emotional distress, negligent infliction of emotional distress, and common law negligence. She also brings Eighth Amendment claims under 42 U.S.C. § 1983 against the individual guards.

This opinion concerns the guards' motion for summary judgment as to Doe's Eighth Amendment claims.  Doe does not oppose the grant of summary judgment on these claims with respect to four of the officials.  But she does oppose the motion with respect to Gladden and Ogu (herein, "Defendants").  Because a reasonable jury could find that Gladden and Ogu acted with "deliberate indifference" to Doe's safety, and because Doe's right to be free from deliberate indifference to sexual assault at the hands of other inmates was clearly established at the time, Gladden and Ogu's motion will be denied.

## I.     BACKGROUND

Because Doe is the nonmoving party, the Court views the evidence in the light most favorable to her.[1]  *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).  Where the parties have disagreed over details in the factual recitation that follows, the Court has assumed that Doe's version of events is correct.

### A.     Doe's Incarceration Before July 17, 2012

Plaintiff Jane Doe is a transgender woman.  At the times relevant here, she was twenty years old, was undergoing hormone therapy, and had developed breasts.  Dkt. 76-1 at 2 (Ex. 4[2]); Dkt. 77-3 at 98 (Doe Dep. 146).  She wore a training bra.  Dkt. 77-3 at 98 (Doe Dep. 146).  Her voice was high enough in pitch that Gladden "suspected [Doe] was a transgender female based upon her voice."  Dkt. 77-9 at 8–9 (Ex. 2) (Gladden's Resp. to Req. for Admis. 6).  Another defendant testified that Doe "[d]oesn't look like a man."  Dkt. 74 at 21 (Adjanla Dep. 12).  Doe

---

[1]  For purposes of this decision, the Court assumes (but does not decide), among other things, that Johnson committed the rapes described below.

[2]  Numbered exhibits were submitted by Doe.  Lettered exhibits were submitted by Defendants.

describes her own appearance as "feminine" with "a slight build."  Dkt. 33-1 at 2 (Am. Compl. ¶ 2).  She stands five feet and five inches tall.  Dkt. 76-1 at 2 (Ex. 4).

Beginning on June 21, 2012, Doe was incarcerated at the District of Columbia's Central Detention Facility ("D.C. Jail"), which is operated by the D.C. Department of Corrections ("DOC").  Dkt. 76-1 at 92 (Ex. 34); *accord* Dkt. 70 at 3 (Defs.' SUMF ¶ 1).  In accordance with DOC transgender housing guidelines, Dkt. 77-11 at 47 (Ex. 33), jail intake officials noted Doe's transgender status and recorded it in the Jail Community Corrections System database ("JACCS"), Dkt. 77–3 at 10 (Doe Dep. 58); *see* Dkt. 76-1 at 92 (Ex. 34) (JACCS printout); *see also* Dkt. 77-4 at 12–13 (Gladden Dep. 12–13).  It appears that Doe signed a waiver indicating her request to be housed according to her biological sex (male), rather than her expressive gender (female).  *See* Dkt. 82-1 at 2 (Ex. M).[3]  She was sentenced on June 25, 2012.

Between June 21 and July 16, 2012, Doe was housed in the "Northeast One" cellblock. Dkt. 76-1 at 92 (Ex. 34).  According to Corporal Kiana Reid, Northeast One is a "Protective Custody Unit" for "inmates that generally fear for their safety."  Dkt. 77-7 at 11 (Reid Dep. 27). Protective custody is "[a] form of separation from the general population for inmates requesting or requiring protection from other inmates for reasons of health or safety."  Dkt. 77-11 at 55. Jail records indicate that Doe requested protective custody for herself because she "fear[ed] for [her] safety" among the general population.  Dkt. 76-1 at 87 (Ex. 28); *see also* Dkt. 77-7 at 22 (Reid Dep. 38) ("[Doe] chose to go to a Protective Custody Unit.").  Doe's protective custody status was apparent from her file on JACCS.  Dkt. 77-7 at 22 (Reid Dep. 38).  Indeed, the top of

---

[3]  Because Defendants submitted Exhibit M (the housing waiver form) only in their reply brief, Doe has not had an opportunity to contest its validity.

Doe's JACCS file stated "Alerts: KS . . . TRANSGENDER," where "KS" means "keep separated."  Dkt. 76-1 at 92 (Ex. 34); *accord* Dkt. 77-4 at 40 (Gladden Dep. 40).

On July 16, 2012, Doe was transferred to cell 57 of the "North One" cellblock but remained on protective custody status.  Dkt. 76-1 at 87 (Ex. 28); *id.* at 92 (Ex. 34).  Unlike Northeast One, North One is "a segregation unit."  Dkt. 77-7 at 10 (Reid Dep. 26).  North One houses at least some "protective-custody inmates," but most inmates there have "a disciplinary infraction" or have been placed in "involuntar[y] protective custody."  *Id.* at 11 (Reid Dep. 27); *see also* Dkt. 77-3 at 91 (Doe Dep. 139) ("North 1 is a whole different block.  It's not a protective custody block.").  Prison officials transferred her to North One because another inmate "placed a note on her," which the DOC Housing Board found to represent "a clear and present threat to [Doe's] personal safety."  Dkt. 76-1 at 87 (Ex. 28).  In Doe's words:  "[A] lieutenant came . . . to my cell[ and] said, 'Ms. [Doe], somebody dropped a note on you . . . saying that they want to kill you . . . .'  So they moved me off the unit."  Dkt. 77-3 at 54 (Doe Dep. 102).  Although there is evidence that Doe opposed the transfer and denied the need for continued protective custody,[4] the Housing Board kept her in protective custody nonetheless.  Dkt. 76-1 at 87 (Ex. 28).

---

[4]  Jail records from July 17, 2012, state that Doe "deni[ed] the need for [protective custody] and signed a [protective custody] waiver to [be] moved back to [Northeast One]."  Dkt. 76-1 at 87 (Ex. 28).  At Doe's deposition, Defense counsel presented Doe with a purported copy of that waiver, which was dated July 17, 2012.  *See* Dkt. 77-3 at 13 (Doe Dep. 61).  In Defendants' reply brief, they assert that Doe signed a waiver of protective custody on June 28, 2012.  *See* Dkt. 86-1 at 15.  Defendants fail to attach a copy of any protective custody waiver, however, and no such document is before the Court.  Doe, for her part, maintains that she "want[ed] to be in protective custody," Dkt. 77-3 at 12 (Doe Dep. 60), and only asked to be removed from it once she was transferred to the Washington Hospital Center *after* she was raped, *id.* at 27 (Doe Dep. 75).

When Doe arrived at North One, her case manager, Winifred Hawkins, told the officer on duty, Corporal Reid, that Doe "was to be on house[ ]-alone status." Dkt. 77-7 at 28 (Reid Dep. 44). Reid understood this to mean "that [Doe] should not have a cell mate." *Id.*; *accord* Dkt. 77-5 at 5 (Hawkins Dep. 66) ("[I]f there was not a transgender available to go in [Doe's] cell, I would not allow anyone else to go into [her] cell."). Reid accordingly left a note on the command center bulletin board—the "small piece of poster board where [officers] put all the inmates['] names . . . so that [the officers] can look and see." Dkt. 77-7 at 27 (Reid Dep. 43); *see also* Dkt. 77-3 at 23–25 (Doe Dep. 71–73). The bulletin board is located in "the Bubble," which is the central office of the North One cellblock. Dkt. 77-3 at 24 (Doe Dep. 72); Dkt. 77-7 at 13–14 (Reid Dep. 29–30). The Bubble has transparent walls, and is visible from the hallways adjoining the inmates' cells. Dkt. 77-7 at 14 (Reid Dep. 30). The note Reid left on the bulletin board next to Doe's name read, "per the case manager, house alone." *Id.* at 28 (Reid Dep. 44). Reid also wrote in the North One logbook that Doe was to be housed alone. *Id.* at 30 (Reid Dep. 46).

## B.      Johnson's Incarceration Before July 17, 2012

Leonard Johnson was also incarcerated in the North One cellblock at that time. He was serving a 69-month sentence for conspiracy and weapons convictions arising out of a scheme in which he agreed to be shot by another D.C. Jail inmate in order to create a basis for a lawsuit against the District of Columbia. Dkt. 77-9 at 19, 37 (Ex. 7). He was also awaiting trial on charges of possession of a prohibited weapon and unlawful possession of liquid PCP. Dkt. 76-1 at 94 (Ex. 37). As of 2011, Johnson "ha[d] been booked into the [D.C. Jail] on 18 separate occasions since 1995." Dkt. 76-1 at 32 (Ex. 8). He is six feet and one inch tall. Dkt. 76-1 at 42 (Ex. 9).

Johnson had a history of sexual violence in the D.C. Jail.  On December 7, 2011, he raped his then-cellmate, who identified as homosexual.  Dkt. 76-1 at 35 (Ex. 8).  The DOC's Office of Internal Affairs conducted an investigation and identified two failures among the jail staff that resulted in the rape.  First, the Jail's Correctional Treatment Specialist erred by overlooking Johnson's "previous violent institutional behavior involving a weapon," causing Johnson to be assigned to a "Medium" custody unit rather than "Maximum."  *Id.* at 36.  Second, James Holbrook—also a defendant here—erred by failing to contact the compliance officer before authorizing Johnson's transfer between cells.  *Id.*  This failure violated the Northeast One Post Order, *i.e.*, the protocol for jail officers in that cellblock, *id.*, and placed Johnson's cellmate at substantial risk of sexual assault.  Johnson was later transferred to North One, where he remained on the night of July 17, 2012.  Dkt. 76-1 at 53 (Ex. 10).

## C.     Night of July 17–18, 2012

On July 17, 2012, "Shift #3" in the North One block took place between 4:00 p.m. and midnight.  Among the officers working that shift were two defendants in this case:  Lieutenant James Holbrook and Lieutenant Ronald Pope.

At approximately 8:25 p.m., Pope removed Doe from cell 57 and transferred her to cell 24.  Dkt. 77-3 at 15–17 (Doe Dep. 63–65).  Pope told Doe that "all protective custody is moving to [one] side [of the cellblock]."  *Id.*  Doe asked why, but Pope declined to respond.  *Id.*  The JACCS database was soon updated to reflect Doe's transfer, but the "reason for move" field was left empty.  Dkt. 76-1 at 92 (Ex. 34).  Around the same time, Johnson was transferred from cell 53 to cell 22, just down the hall from Doe's new location.  *See* Dkt. 76-1 at 53 (Ex. 10).  No reason for this move was listed, either.  *Id.*

At midnight, "Shift #1" took over, and continued until 8:00 a.m.  Four Shift #1 officers are defendants in this case:  Gladden, Ogu, Sergeant Twan Rhyne, and Private Lanwoe Adjanla. The events that took place during Shift #1 are documented principally through Doe's deposition testimony and video-only security footage from a camera in the hallway outside her cell.[5]

Around 1:35 a.m., Gladden had a brief conversation with Johnson from outside his cell. *See* Ex. C (Video at 01:34:48–01:35:49).  The record contains no evidence of what was said, however.

1.  *Johnson's First Double-Celling with Doe (1:50 a.m. to 2:46 a.m.)*

Around 1:50 a.m., Gladden and Ogu removed Johnson from cell 22 and placed him in cell 24 with Doe.  Dkt. 70 at 4 (Defs.' SUMF ¶ 9).  The security footage shows that Gladden and Ogu approached Johnson's cell first, where they spoke with him for almost ninety seconds.  Ex. C (Video at 01:47:43–01:49:08).  Gladden says they were speaking about "a problem in Johnson's cell."  Dkt. 77-9 at 9 (Ex. 2) (Gladden Resp. to Req. for Admis. 7).  After Gladden opened the door, Johnson entered the hallway carrying his mattress and two large plastic bags. *Id.* (Video at 01:49:53–01:50:34).  Gladden then walked to Doe's nearby cell, opened her door, and ushered Johnson inside.  *Id.* (Video at 01:50:34–01:51:31).  Johnson dropped some of this belongings in the cell and returned to retrieve the remainder.  *Id.*

As Johnson moved himself in, Gladden spoke to Doe for about forty seconds.  *Id.* (Video at 01:50:53–01:51:31).  According to Doe, they had an exchange along the following lines:

---

[5]  Defendants have also identified a report on the evening prepared by a DOC investigator on July 19, 2012.  *See* Dkt. 73 at 5 (Ex. B).  Doe, however, objects to this report as inadmissible hearsay.  Dkt. 77-1 at 4.  Although Defendants nominally invoke the business records exception for hearsay under Rule 803(6) of the Federal Rules of Evidence, they offer no factual support to show that the exception applies.  *See* Dkt. 86-1 at 25.  For the purposes of this motion, therefore, the Court will disregard that report.  *See* Fed. R. Civ. P. 56(c)(2).

| Gladden: | "Is it okay for him [Johnson] to stay here?" |
|---|---|
| Doe: | "No, . . . I [am] supposed to be housed alone. . . . Nobody is supposed to be here with me." *Id.* |
| Gladden: | "Well, he's going in here anyway. . . . [H]e's only going to be here for a couple of minutes." |
| Doe: | "Okay, it's fine with me if he's only going to be here for a couple of minutes." |

Dkt. 77-3 at 21–23 (Doe Dep. 69–71).  Even after Doe relented, however, she "kept trying to tell them nobody is supposed to be housed with [her]" and that it said so "on the bulletin board."[6] *Id.* at 23–24 (Doe Dep. 71–72).  Without responding, Ogu locked the door.  *Id.*; Ex. C (Video at 01:51:31).

Notwithstanding Gladden's assurance that Johnson would remain in the cell for only "a couple of minutes," he was left there for almost an hour, from 1:50 a.m. to 2:46 a.m.  Twice during that span, Gladden returned to cell 24 and spoke briefly with one or both occupants, but did not remove either one.  Ex. C (Video at 02:15:43–02:16:03, 02:24:53–02:25:29).  At some point—although it is unclear when—Doe asked to speak to the warden.  Dkt. 77-3 at 22–23 (Doe Dep. 70–71).  She was told to fill out a grievance form instead.  *Id.*  Doe requested such a form on multiple occasions, but never received one.  *Id.*  Finally, at 2:46 a.m., Gladden and Ogu took Johnson out of the cell.  Ex. C (Video at 02:42:56–02:46:12).

---

[6]  It is unclear from Doe's deposition whether she testified that she told Gladden and Ogu that "house alone" was written on the bulletin board. or merely that "nobody [was] supposed to be housed with [her]."  *See id.* at 23–24 (Doe Dep. 71–72) ("I kept trying to tell them nobody is supposed to be housed with me.  It's on the bulletin board.").  Nonetheless, because the Court takes the facts in the light most favorable to the non-movant, the Court will assume Doe did refer to the bulletin board out loud.

2.  *Johnson's Second Double-Celling with Doe (3:02 a.m. to 8:00 a.m.)*

But around 3:00 a.m.—just fourteen minutes after Johnson had been removed—Gladden

ordered Ogu to place Johnson back in Doe's cell.  Dkt. 77–9 at 6 (Ex. 2) (Gladden's Resps. to

Reqs. for Admis. 1–3).  The order was recorded in the North One logbook, which read:

> 3:00/A     Per Order of Lt. Gladden put Inmate Johnson Leonard [sic] . . . in cell
>            with a P/C Med. [Jane Doe] . . . till he can be put in another cell.

Dkt. 77-9 at 2–3 (Ex. 1).  "P/C Med." stands for "protective custody medium security."  *See* Dkt.

73 at 19, 23 (Rhyne Dep. 51–52, 89).  Evidence suggests that many North One cells—including

the cells in which Doe and Johnson began the evening—were vacant at the time.  *See* Dkt. 76-1

at 65–66 (Ex. 14) (JACCS housing data for the North One cellblock as of July 18, 2012, at 12:00

a.m.) (listing no occupants for cells 10, 50, 53, 54, 56, 57, 59, 64, or 65).  In addition, officers

had access to a recreation cell which could have served as a temporary "holding cage" for

Johnson.  *See* Dkt. 77-7 at 39–40 (Reid Dep. 55–56); *see also* Dkt. 77-4 at 77–78 (Gladden Dep.

77–78).  At 3:02 a.m., Ogu placed Johnson back in Doe's cell, locked the door, and walked

away.  Ex. C (Video at 03:02:16).  Johnson was left in Doe's cell for the rest of the night.

Between approximately 3:00 a.m. and 4:00 a.m., inmates "on detail" delivered breakfast

to the cells.  Ex. C (Video).  Some of these inmates were Johnson's friends, and would "yell or

bang on the door to get his attention."  Dkt. 77-3 at 76 (Doe Dep. 124).  They would also speak

to Johnson in slang that Doe did not understand.  *Id.* at 78 (Doe Dep. 126).  Doe asked them to

stop.  *Id.* at 85 (Doe Dep. 133).  At one point, one of them yelled to Johnson, "[T]here's

something in y'all's cell."  *Id.* at 74 (Doe Dep. 122).  Apparently taking guidance from the

inmates, Johnson asked Doe to help him retrieve two "contraband" items hidden in the cell's

light fixture.  *Id.* at 74, 82, 85–86 (Doe Dep. 122, 130, 133, 134).  Doe refused.  *Id.* at 75 (Doe

Dep. 123).  But Johnson eventually retrieved the items himself—and revealed one of them to be

a makeshift knife.  *Id.* at 74–75, 84, 89 (Doe Dep. 122–23, 132, 137).  Johnson hid the knife in one of his bags.  *Id.* at 90 (Doe Dep. 137).

In the hours that followed, although it is not clear exactly when, Johnson raped Doe twice.  Dkt. 77-3 at 92–95 (Doe Dep. 140–143).  When Doe resisted, Johnson warned her, "[D]on't make me go in my bag."  *Id.* at 94–95 (Doe Dep. 142–43).  Doe was too scared to scream.  *Id.* at 156 (Doe Dep. 204).  She worried that, if she did, Johnson would use the knife against her.  *Id.*  She also believed screaming would have been futile, as the only guards were in "the Bubble" and would not have been able to hear her.  *Id.* at 58, 95 (Doe Dep. 106, 143).  In between rapes, Doe went to the window on her cell door to ask the guards for help—but no guards were present.  *Id.* at 96 (Doe Dep. 144).  She testifies that "nobody came" or "did a security check."  *Id.*

The surveillance tape shows intermittent activity outside cell 24 between 4:00 a.m. and 8:00 a.m.  The inmates on detail continued occasionally to stop outside cell 24 and speak to Johnson.  Ex. C (Video); *accord* Dkt. 70 at 5–6 (Defs.' SUMF ¶ 11).  They can be seen pressing their faces close to the window in order to see inside and holding their hands up to their ears in order to hear.  Ex. C (Video).  Although the inmates continued their detail work throughout the night, the pace of their interactions with cell 24 slowed over time and by 5:30 a.m. had ceased.  *Id.*  At that point, the inmates seemed to switch their attention to cell 23.  *Id.*

According to the surveillance footage, an officer looked into cell 24 only once after 4:00 a.m.:  At approximately 4:08 a.m., an officer paused outside the cell, looked in the window, and appeared to say one word.  Ex. C (Video at 04:08:05–04:08:11).  Although officers walked past the cell at other times, they did not pause there, look into the cell's window, or interact with its occupants.  *See, e.g.*, *id.* (Video at approximately 03:14, 03:35, 04:06, 04:38, 04:30, 05:11–

05:13, 05:27, 05:33, 05:55–59, 06:52, 07:22–25); *see also* Dkt. 70 at 5–6 (Defs.' SUMF ¶ 11)

(summarizing surveillance footage).[7]  Similarly, around 5:06 a.m., an officer briefly unlocked

the slot on the door of cell 24 so that an inmate on detail could give a cup of water to the cell's

occupants, but the officer did not look inside or interact with those occupants.  *Id.* (Video at

05:05:22–05:06:10).  According to the North One logbook for the evening, the last "security

check" occurred at 4:06 a.m.  Dkt. 77-9 at 3 (Ex. 1).

At 7:47 a.m., the Shift #2 officers, including Reid, relieved Gladden and Ogu from duty.

Dkt. 77-9 at 3 (Ex. 1); *id.* at 44 (Ex. 13).  Reid then conducted a "count" of the inmates and

noticed that Doe was improperly double-celled with Johnson.  Dkt. 77-1 at 38–39 (Reid Dep.

54–55); *see also* Ex. C (Video at 07:48:04).  Shortly thereafter, she "told [Johnson] to get up and

put his arms out to be cuffed," "took him out of the cell," and "placed him in a holding cage."

Dkt. 77-1 at 39 (Reid Dep. 55).  Later that day, Doe was sent to the Washington Hospital Center,

where nurses documented her injuries as consistent with anal rape.  *See* Dkt. 76-1 at 18 (Ex. 5);

Dkt. 76-1 at 22 (Ex. 6).

**D.    Jail Protocols**

1. *Security Checks*

The "Post Order" for North One in effect on July 17–18, 2012, required guards to

complete "security checks" no less than every thirty minutes.  Specifically, the Post Order

provided:

---

[7]  The Court notes two errors in Defendants' summary of the footage.  Although Defendants claim that an officer can be seen listening to someone in cell 24 at 5:17 a.m., the person listening was not an officer but an inmate on detail.  Similarly, Defendants state that an officer "stops in front of cell 24" at 5:55 a.m., but the officer in fact walked past the cell without pausing.

**Security Inspection**: An inspection of the housing unit that involves a patrol of all areas in the housing unit. It shall include observation of[, among other things,] windows [and] . . . condition[s] of inmates[,] and [shall be] documented in the unit logbook. . . .

Correctional Officers shall patrol all areas of the cell block at least every thirty (30) minutes on an irregular basis to provide security, to discourage contraband trafficking and [to] maintain appropriate surveillance. Patrols shall be recorded in the unit logbook indicating the area checked and the officer conducting the check.

Dkt. 77-11 at 55, 58 (Ex. 35). At deposition, both Gladden and Ogu confirmed that regular security checks were part of their duties on the evening in question. Dkt. 77-4 at 7 (Gladden Dep. 7); Dkt. 77-6 at 5 (Ogu Dep. 56). In their words, a "security check" means "you walk around and do a visual inspection. You check inmates." Dkt. 77-4 at 53 (Gladden Dep. 53); *accord* Dkt. 77-6 at 6 (Ogu Dep. 57) ("You go from cell to cell and you listen, watch, and smell. . . . [You] look at the inmate to make sure he's still there."). Gladden also confirmed that, "if an officer just walked down the hallway walking past the cells without looking in, that would not be a correct security check." *Id.* He agreed that "security checks are important" to "help prevent a rape from happening in the cell." *Id.* at 54.

Doe's expert opines that, based on the security footage of Johnson's double-celling with Doe, "no officer actually visually checked on [their cell]" in a manner that would satisfy D.C. Jail policies and established industry standards. Dkt. 76-1 at 82 (Ex. 15) (Eiser Prelim. Expert Report ¶ 11). Indeed, just one time does the footage show an officer looking into cell 24 while both Doe and Johnson were housed there. *See* Ex. C (Video at 04:08:05–04:08:11).

2. *Inmate Transfer Protocol*

The North One Post Order also specifies a protocol for transferring inmates between cells. It provides:

In all cases of inmate housing reassignment or change, it is the responsibility of the Compliance Officer to coordinate movement with the officer in charge of the housing unit who shall document it by log book entry indicating name, DCDC number and Housing Unit to which reassigned.

**No inmate shall be moved without prior authorization of the Zone Supervisor and the Compliance Officer. All reassignments shall be telephonically communicated to the Compliance Officer by the Zone Supervisor.**

Dkt. 77-11 at 57. The boldface and underlining appear in the original Order. *See id.* It is the compliance officer's job to "monitor cell assignments." Dkt. 77-8 at 3 (Shannon Dep. 28). As such, that officer has access to more detailed information about inmates' histories, whereas normal officers are "given very restrictive information" in order to protect inmate privacy. *Id.*

Gladden acknowledged at his deposition that he did not have access to sufficient information to make safe and proper housing assignments in every situation. He agreed, for example, that "if there [are] two inmates, one [of whom] pose[s] a threat to other inmates and one who was vulnerable, those two inmates should not go into a cell together." Dkt. 77-4 at 18 (Gladden Dep. 18). But Gladden apparently could not tell from JACCS whether an inmate had a history of violence toward other inmates. *Id.* at 41–42. Nonetheless, it is undisputed that Gladden did not attempt to contact the compliance officer before moving Johnson on either occasion on the night of July 17. Dkt. 86-1 at 22. In fact, Gladden testified that he did not believe he was required to contact the compliance officer at all. Dkt. 77-4 at 33 (Gladden Dep. 33).

### E.    Defendants' Testimony

#### 1.    *Gladden*

Gladden has worked at DOC for more than twenty-seven years. Dkt. 77-4 at 7 (Gladden Dep. 7). As a matter of course, he can access JACCS, the North One unit logbook, and the bulletin board in "the Bubble." *Id.* at 11–12, 26–29 (Gladden Dep. 11–12, 26–29). He knows

that "house alone" status means that "[i]nmates should be housed alone," *id.* at 26 (Gladden Dep. 26), and that the "KS" designation on Doe's JACCS file meant that she was on protective custody status and should have been "ke[pt] separated," *id.* at 40.  He also knows that "an inmate might be in protective custody in [North One] because another inmate poses a threat to [her]." *Id.* at 18.  He knows that if one inmate had previously raped another, the rapist "shouldn't have a cellmate."  *Id.* at 72.  Nonetheless, Gladden has "[n]ever taken steps to learn whether an inmate had previously raped another inmate."  *Id.*  That information, he says, is not available to him in the JACCS system.  *Id.* at 73.  But, according to Reid, when one inmate rapes another inmate, "[n]otification [is] made" to all officers with rank "lieutenant . . . or above."  Dkt. 77-7 at 25 (Reid Dep. 41).

Gladden acknowledges that he ordered Ogu to place Johnson in Doe's cell at around 3:00 a.m. on July 18, 2012, as can be seen in the surveillance footage and the North One unit logbook. Dkt. 77-9 at 7–8 (Ex. 2) (Gladden Resp. to Reqs. for Admis. 1–3).  He denies knowing that Johnson had been accused of raping his previous cellmate.  *Id.* at 7 (Gladden Resp. to Interr. 10). He "suspected" Doe was transgender at the time, *id.* (Gladden Resp. to Req. for Admis. 6), but denies knowing that "transgender inmates are particularly vulnerable to sexual assault," Dkt. 77-4 at 65–66 (Gladden Dep. 65-66).  Gladden has been informed of that fact since then, however.  *Id.*  His training records show that, as of July 2012, he had been trained regarding the DOC's Program Statement on the Elimination of Sexual Assault Policy, the Prison Rape Elimination Act, and the DOC's Program Statement on Gender Housing Classification.  *See* Dkt. 77-11 at 2–12 (Ex. 30).

2. *Ogu*

Ogu disclaims any specific knowledge of the night of July 17, 2012. *See generally* Dkt. 77-9 at 13–16 (Ex. 3) (Ogu's written discovery responses). He acknowledges, however, that the surveillance footage from that night shows him placing Johnson into Doe's cell. *Id.* Ogu does not remember whether he read the North One Post Order on July 17, 2012, but states that he reads it "habitually . . . before each shift." *Id.* at 16 (Ogu Resp. to Req. for Admis. 4). Ogu testifies that he had only limited access to JACCS, but was familiar with the term "house alone." Dkt. 74 at 12 (Ogu Dep. 23–24). Ogu knows that transgender inmates are especially vulnerable to assault, but does not know when he first became aware of that fact. Dkt. 77-6 at 7 (Ogu Dep. 105). Like Gladden, Ogu had been trained prior to July 2012 on the DOC's Program Statement on the Elimination of Sexual Assault Policy, the Prison Rape Elimination Act, and the DOC's Program Statement on Gender Housing Classification. *See* Dkt. 77-11 at 73–77 (Ex. 36).

## II.     STANDARD OF REVIEW

The moving parties are entitled to summary judgment under Federal Rule of Civil Procedure 56 if they "show[ ] that there is no genuine dispute as to any material fact and [that they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When, as here, the plaintiff bears the ultimate burden of proof, but the defendant has moved for summary judgment, the defendant "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it could affect the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court, moreover, must view the evidence in the light

most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor.  *Talavera*, 638 F.3d at 308.

"Although summary judgment is not the occasion for the court to weigh credibility of evidence, . . . summary judgment is appropriate if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* (internal citations and quotation marks omitted). The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor.  *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment.  *Liberty Lobby*, 477 U.S. at 249–50.

### III.   ANALYSIS

Gladden and Ogu move for summary judgment on Doe's § 1983 claim on the grounds that they are protected by qualified immunity.  Under this doctrine, government officials are shielded from claims for money damages unless a plaintiff demonstrates "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  Courts may approach the steps in either order.  *Id.*  Here, the Court will start with the merits of Doe's constitutional claim.

### A.      Eighth Amendment Violation

The framework for Doe's Eighth Amendment "failure to protect" claim is set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994).  Although *Farmer* is the controlling decision for any such claim, it is "particularly instructive here" given its "significant factual parallels to the present case."  *Howard v. Waide*, 534 F.3d 1227, 1235–36 (10th Cir. 2008); *see also Makdessi v. Fields*, 789 F.3d 126, 134 (4th Cir. 2015).  Dee Farmer, like Doe, was a young, transgender woman serving a prison sentence.  *Farmer*, 511 U.S. at 829.  She had received breast implants, wore women's clothing, and "project[ed] feminine characteristics."  *Id.*  Although Farmer "voiced no objection" when she was transferred to the prison's "general population," less than two weeks later she was "beaten and raped by another inmate in [her] cell."  *Id.*  at 830.  She subsequently brought a constitutional tort claim alleging, among other things, that prison officials violated her Eighth Amendment rights by housing her with the general population "despite knowledge that [she], as a [transgender woman], would be particularly vulnerable to sexual attack."  *Id.* at 830–31.  The district court granted summary judgment for defendants on the ground that Farmer failed to provide the prison officials notice of the danger, and the Seventh Circuit summarily affirmed.  *Id.* at 831–32.

Vacating and remanding, the Supreme Court confirmed that "prison officials have a [constitutional] duty to protect prisoners from violence at the hands of other prisoners."  *Id.* at 833 (quotation and alteration omitted).  Some aspects of prison life are harsh by design, but "allowing the beating or rape of one prisoner by another serves no 'legitimate penological objective'" and "is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'"  *Id.* at 833–34 (citations and alteration omitted).  Thus, the Supreme Court explained, an officer's failure to protect an inmate from harm violates the Eighth Amendment's

prohibition against cruel and unusual punishments—but only if two requirements are met. *First*, the inmate must have been "incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 834. "Substantial risk" is measured from an objective standpoint, and harm is "serious" if it "result[s] in the denial of the minimal civilized measure of life's necessities." *Id.* (citation and internal quotation marks omitted). *Second*, the inmate must show that the official had a "sufficiently culpable state of mind," which is one of "deliberate indifference." *Id.* "[D]eliberate indifference describes a state of mind more blameworthy than negligence," but does not require proof that the defendant purposefully caused harm or acted with "a knowing willingness that [harm] occur." *Id.* at 835–36 (alteration in original). Rather, an officer acts with "deliberate indifference" if he "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837.

After articulating the framework, the Supreme Court remanded the case for the district court to apply it. *Id.* at 848–49. In particular, the district court was to consider the fact that Farmer was "a 'non-violent' transsexual who, because of [her] 'youth and feminine appearance' [was] 'likely to experience a great deal of sexual pressure' in prison." *Id.* 848 (quoting the record). This was potentially "relevant evidence" for establishing the officers' "subjective knowledge" under the second *Farmer* prong. *Id.*

This Court, armed with *Farmer* and two decades of subsequent lower court opinions, will consider the two *Farmer* prongs in turn.

1. *Objective Risk of Serious Harm*

Whether Defendants intend to dispute *Farmer*'s first prong is unclear. *See* Dkt. 70 at 2 (listing the second prong but not the first as a ground for Defendants' motion). Nonetheless, their briefs contain arguably-relevant language, *see id.* at 14–16, 18; Dkt. 86-1 at 4 n.3, and

Doe's opposition does address the issue, *see* Dkt. 77 at 14–17.  The Court will therefore treat it as disputed.  Under *Farmer*, Doe is entitled to prevail on the objective prong if (1) she proves that sharing a cell with Johnson put her at a "substantial risk" of rape and (2) rape is "sufficiently serious" to warrant protection under the Eighth Amendment.  *See* 511 U.S. at 834.  The first issue requires findings of fact; the second is a question of law.  *See Thomas v. Bryant*, 614 F.3d 1288, 1307 (11th Cir. 2010).

As to the legal issue, rape is without question a deprivation of rights "sufficiently serious" to violate the Eighth Amendment.  *See, e.g.*, *Howard*, 534 F.3d at 1237 ("Of course the harm of sexual assault is 'serious' enough to have Eighth Amendment implications."); *Jensen v. Clarke*, 94 F.3d 1191, 1198 (8th Cir. 1996) ("Assault at the hands of fellow inmates . . . is a 'serious harm'"); *cf. Farmer*, 511 U.S. at 852–53 (Blackmun, J., concurring) ("[Prison rape] is the equivalent of torture, and is offensive to any modern standard of human dignity.").  Defendants appear to concede as much.  *See* Dkt. 70 at 14 (agreeing that sexual assault by Johnson was "objectively sufficiently serious").  Although Defendants go on to argue that "freedom from violence"—including, presumably, rape—"is not one of life's necessities," *id.* at 15–16, this argument is inconsistent with *Farmer* and misunderstands the law.  In fact, "[whether] the prison official's act . . . result[ed] in the denial of . . . life's necessities" is the *standard* by which courts decide if the harm was "sufficiently serious."  *Farmer*, 511 U.S. at 834; *see, e.g.*, *Powers-Bunce v. District of Columbia*, 541 F. Supp. 2d 57, 66 (D.D.C. 2008); *Caldwell v. Caesar*, 150 F. Supp. 2d 50, 61 (D.D.C. 2001).  And, as explained, rape clearly meets this test.

On the factual issue, Defendants fail to carry their initial summary judgment burden.  They assert that Doe "has no evidence to show that there was a significant risk of rape to

transgender inmates at the D.C. jail," Dkt. 70 at 18, but they nowhere "identify[ ] those portions of [the record]" that "demonstrate the absence of a genuine issue of material fact" on that point, *Celotex*, 477 U.S. at 323; *see* Dkt. 70 at 3–10 (Defs.' SUMF).  Defendants also mistake the relevant standard.  The question is not whether, in general, transgender women in D.C. Jail faced a substantial risk of rape; it is whether *Doe* stood a substantial risk of rape because of Gladden and Ogu's conduct.  Indeed, *Farmer* expressly states that "whether a prisoner faces an excessive risk of attack for reasons personal to [her] or because all prisoners in [her] situation face such a risk" "does not matter."  511 U.S. at 843.  Although Defendants cite *Murphy v. United States*, 653 F.2d 637, 644–45 (D.C. Cir. 1981), for the proposition that a plaintiff can succeed *only* by "show[ing] that violence was so pervasive that prison officials must have been deliberately indifferent to [her] safety," Dkt. 70 at 18, *Murphy* says no such thing, and is no longer good law to the extent it contradicts *Farmer*.

In any event, Doe has produced evidence sufficient for a reasonable jury to find that Gladden and Ogu put her at substantial risk of rape when they left her unsupervised overnight with Johnson:

*First*, a reasonable jury could find that Doe was unusually vulnerable to rape because she was a transgender woman.  *See Farmer*, 511 U.S. at 843 ("[A] prisoner can establish exposure to a significantly serious risk of harm by showing that [s]he belongs to an identifiable group of prisoners who are frequently singled out for violent attack by other inmates." (quotation omitted)).  There is evidence that Doe was a young, small, feminine, transgender inmate with breasts; that she was placed in protective custody as soon as she arrived in order to protect her from other inmates; and that the DOC Housing Board kept her in protective custody, possibly against her will, because another inmate had become a "clear and present threat to [her] personal

safety." *See supra* Part I.A.  And Doe has supplied evidence that transgender women as a class face a heightened risk of prison rape.  *See, e.g.*, Dkt. 76-1 at 79 (Ex. 15) (Eiser Prelim. Expert Report ¶ 9) ("It is well known in the jail industry that transgender inmates, especially transgender female inmates, can be easy targets for 'predatory' inmates looking to take advantage of them."); Dkt. 77-9 at 49, 52 (Ex. 16) (*National Prison Rape Elimination Commission Report* 7, 73 (2009)) ("Research on sexual abuse in correctional facilities consistently documents the vulnerability of . . . transgender individuals. . . . Male-to-female transgender individuals are at special risk."); Dkt. 80-1 at 69 (Ex. 24) (Amnesty International USA, *Stonewalled: Police Abuse and Misconduct Against Lesbian, Gay, Bisexual, and Transgender People in the U.S.* 60 (2005)) ("[T]ransgender detainees are at high risk of violence from other prisoners; transgender women in particular may be at heightened risk of torture or ill-treatment if they are placed in male jails or holding cells, as such placement may put an individual at risk of physical or sexual assault."); *id.* at 94 (Ex. 25) (Stop Prison Rape, *In the Shadows: Sexual Violence in U.S. Detention Facilities* 14 (2006)) ("Transgender inmates who have developed breasts and a feminine appearance . . . are especially vulnerable to various forms of sexual harassment, such as . . . sexual touching by male prisoners . . . .").

*Second*, a jury could find that Johnson was a violent predator.  Indeed, Johnson had a history of sexual assault and had raped another cellmate less than eight months prior.  *See supra* Part I.B.  This fact supports a finding that being double-celled with Johnson put Doe at objective risk of rape.

*Finally*, a jury could find that Doe was at heightened risk because of Gladden and Ogu's failure to perform adequate security checks.  *See supra* Part I.D.1; *see also, e.g.*, *Whitson v. Stone Cnty. Jail*, 602 F.3d 920, 924 (8th Cir. 2010) (recognizing that a "lack of visual contact with the

victim and the aggressor by the remotely located supervisor" and "an almost total lack of supervision" supported a finding of objective risk of harm).

    2.  *Subjective "Deliberate Indifference"*

To prevail on the subjective prong of *Farmer*'s test—*i.e.*, to establish "deliberate indifference"—Doe must prove as a factual matter that Gladden and Ogu "knew of and disregarded" the risk established in the first prong, *i.e.*, the risk that Johnson would rape her if left unsupervised in her cell overnight.  *See* 511 U.S. at 837.

    a.  <u>Knowledge of Risk</u>

The Court begins with the knowledge component.  The question is not whether Gladden and Ogu "should have known" of the risk that Doe would be raped; the test is "actual knowledge."  *Farmer*, 511 U.S. at 837, 843 & n.8.  The officials must have been "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists," and they "must also [have] draw[n] the inference."  *Id.* at 837.  But this does not mean that officials can always avoid liability merely by claiming they failed to comprehend the risk.  Rather, "[w]hether a prison official had the requisite knowledge" is "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."  *Id.* at 842.  Critically, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Id.*  Of course, the risk must have been "obvious" to the official based on information with which he had been presented.  So, for example, if a risk has been "longstanding, pervasive, well-documented, or noted by prison officials in the past," and if the defendant official "had been exposed" to that information, a factfinder could infer that the official had actual knowledge of the risk—*i.e.*, that he "'must have known' about it."  *Id.* at 842–43.

Accordingly, if a prison official knew or had been exposed to information suggesting that an inmate was at significant risk of assault, a reasonable jury could conclude that the official knew about that risk. At times, the knowledge of the risk of assault can be inferred from knowledge of the inmate's own characteristics—such as being a transgender woman. *See, e.g.*, *Farmer*, 511 U.S. at 848 (remanding to decide whether admission that transgender women are "likely to experience a great deal of sexual pressure in prison" rendered the risk of Farmer's assault obvious); *Stover v. Corr. Corp. of Am.*, 12-cv-00393, 2015 WL 874288, at *10 (D. Idaho 2015). Risk of assault can also be found "obvious" if the plaintiff had other vulnerability-enhancing traits of which defendants were aware—including, for example, having "physical and mental problems," *Makdessi*, 789 F.3d at 134–35; being "openly gay and slight of build," *Howard*, 534 F.3d at 1238; being on protective custody or another housing status that might imply that the inmate was on protective custody and at risk of being harmed by another inmate, *Giroux v. Somerset Cty.*, 178 F.3d 28, 33 (1st Cir. 1999); or even being a "small, youthful prisoner[ ]," *Taylor v. Michigan Dep't of Corr.*, 69 F.3d 76, 82 (6th Cir. 1995). In addition, the knowledge of the risk may be inferred from knowledge of the offender's propensity for violence, *see, e.g.*, *Billman v. Indiana Dep't of Corr.*, 56 F.3d 785, 788–89 (7th Cir. 1995), or from knowledge that adequate prison safeguards are not in place, *see, e.g.*, *Whitson*, 602 F.3d at 925 (officers' failure to "adequately observe inmates" and failure "to provide adequate attention to security during transfers" supported inference of deliberate indifference).

This inquiry, like any state-of-mind determination, is ultimately fact-bound and dependent on both witness credibility and those inferences that a jury can reasonably draw from the relevant circumstances. It is therefore ill-suited for summary judgment in all but the clearest of cases. *See, e.g.*, *Gatoil (U.S.A.), Inc. v. Wash. Metro. Area Transit Auth.*, 801 F.2d 451, 456

(D.C. Cir. 1986) ("[D]isputes as to parties' subjective mental states are notoriously difficult to resolve on motion for summary judgment."). Here, Doe identifies ample evidence that, when viewed in the light most favorable to her, could permit a reasonable jury to find that Gladden and Ogu knew they were placing Doe at substantial risk of being raped. *See* Dkt. 77 at 25–39.

*First*, a jury could infer that Gladden and Ogu knew Doe faced a substantial risk of rape because of her status as a transgender woman. There is little doubt that both Defendants knew Doe was transgender. Gladden admitted as much, Dkt. 77-9 at 8–9 (Ex. 2) (Gladden Resp. to Req. for Admis. 6), and it would have been apparent to Ogu from Doe's appearance and voice, *see supra* Part I.A, and potentially from Doe's JACCS file, *see* Dkt. 76-1 at 92 (Ex. 34). A jury could also find that both Defendants understood the special risks transgender women face when housed with men. Indeed, records indicate that, as of July 2012, Gladden and Ogu had at minimum been trained on DOC's policies on gender and housing—which emphasize the special needs of transgender inmates. *See* Dkt 77-11 at 12 (Ex. 30); *id.* at 47–49 (Ex. 33); *id.* at 77 (Ex. 36). Finally, although neither Defendant will confirm that they had direct knowledge of the risks to transgender inmates as of July 2012, they both agree that they understand those risks now. *See* Dkt. 77-4 at 65–66 (Gladden Dep. 65–66); Dkt. 77-6 at 7 (Ogu Dep. 105). Viewed in the light most favorable to Doe, a jury could conclude find Defendants knew the risks of leaving a transgender woman alone in a cell with a male inmate for an extended period of time.

*Second*, a jury could infer that Gladden and Ogu knew that other prison officials had already deemed Doe at risk of assault. This is apparent primarily from Doe's "house alone" status. That status was evident to Defendants because Doe herself informed them of it, because it was written by her name in the North One central office, and because it was written in the North One unit logbook. Dkt. 77-3 at 21 (Doe Dep. 69); Dkt. 77-7 at 28, 30 (Reid Dep. 44, 46).

And a reasonable jury could find that Gladden and Ogu understood that "house alone status" meant that Doe's case manager had already concluded she should not be housed with other inmates, and that doing so would pose a significant risk of assault. *See* Dkt. 74 at 12 (Ogu Dep. 24) (acknowledging familiarity with "house alone" status); Dkt. 77-4 at 26 (Gladden Dep. 26) (acknowledging that "house[ ] alone" status means that "[i]nmates should be housed alone"); *see also id.* at 40 (Gladden Dep. 40) (acknowledging that Doe's JACCS file stated that she should be "ke[pt] separated").

*Third*, a reasonable jury could find that Gladden and Ogu knew that Doe faced a substantial risk of rape as a result of their failure to perform security checks. Both Defendants specifically acknowledged that security checks are part of their job responsibilities, and Gladden acknowledged that security checks are an important tool in preventing rape. *See supra* Part 1.D.1. In addition, a jury could reasonably find that Gladden and Ogu failed to perform any meaningful security checks between 4:08 a.m. and 7:47 a.m. (while the rapes took place), and that this failure was necessarily within their own knowledge. The dearth of checks is evidenced by the testimony of Doe's expert, Doe's own testimony, and the surveillance footage. Notably, the footage displays not a single instance in which a security guard makes visual contact with cell 24 during the relevant three-and-a-half-hour period. Although guards occasionally walked past cell 24 without pausing, a reasonable jury could find that those "checks" did nothing to mitigate the risk that Doe faced and that Defendants knew that Doe was left unguarded with Johnson for all but a few seconds on the night of July 17. Because the inmates communicating with Johnson from the hallway can be seen pressing their ears to the door to hear from inside, a reasonable jury might also infer that the hallway was too loud for a security check to be effective using the sense of hearing alone.

*Finally*, a reasonable jury could infer that Gladden knew that Doe faced a substantial risk of rape because of Defendants' failure to comply with D.C. Jail protocols regarding the transfer of prisoners.  The North One Post Order required him to seek telephonic approval of all cell transfers from the compliance officer, who bears the responsibility of coordinating housing reassignments.  Dkt. 77-11 at 57.  A reasonable jury could find that Gladden was familiar with the Order, given its importance to the unit's protocols and given the testimony that Ogu—Gladden's subordinate—read the Order "habitually" before each shift.  Dkt. 77-9 at 16 (Ogu Resp. to Req. for Admis. 4).  A reasonable jury could also find that Gladden knew, based on his training and experience, that the compliance officer's approval is an important safeguard against inmate-on-inmate attacks.  Gladden understood, for example, that "if there were two inmates, one who posed a threat to other inmates and one who was vulnerable, those two inmates should not go into a cell together."  Dkt. 77-4 at 18 (Gladden Dep. 18).  But this information was not necessarily available to Gladden through JACCS.  *Id.* at 40–41.  Because it is "[t]he compliance officer who actually monitors cell assignments," Dkt. 77-8 at 3 (Shannon Dep. 28), and because compliance officers have access to far more information than lieutenants, *id.*, a reasonable jury could conclude that consulting with the compliance officer approval was the only way for Gladden to access the information.

Gladden does not contend that his failure to notify or seek approval from the compliance officer was an oversight or accidental.  To the contrary, he contends that he "was not required to notify the compliance officer" and "was not required to seek authorization from the compliance officer."  Dkt. 77-9 at 5–6 (Ex. 2) (Gladden Resps. to Reqs. for Admis. 2 & 3).  That contention is at odds with the North One Post Order—which states in bold and underlined text that "[n]o inmate shall be moved without prior authorization of the . . . Compliance Officer," Dkt. 77-11 at

57—and, accordingly, a reasonable jury could disbelieve Gladden's contention.  Yet, even if

Gladden "was not *required* to notify the compliance officer," Dkt. 77-9 at 5 (emphasis added), a

reasonable jury could find that his knowing failure to obtain readily available information about

inmate safety rose to the level of deliberate indifference.  "Prison officials may not simply bury

their heads in the sand and thereby skirt liability."  *Makdessi*, 789 F.3d at 129.  Here, a

reasonable jury could find that this is exactly what Gladden did.

Nothing in Defendants' motion overcomes the cumulative effect of Doe's evidence.

Gladden and Ogu rely solely on their own testimony regarding their own mental states.  *See* Dkt.

70 at 7–8, 20–22; *see supra* Part I.E.  According to Gladden's deposition and written discovery

responses, Gladden did not believe transgender inmates stood a heightened risk of sexual assault,

Dkt. 77-4 at 66 (Gladden Dep. 66); did not know Doe was on "house alone" status, Dkt. 77-9 at

9 (Ex. 2) (Gladden Resp. to Req. for Admis. 9); and knew nothing of Johnson's sexually violent

history, Dkt. 77-4 at 15 (Gladden Dep. 15); Dkt. 77-9 at 7 (Ex. 2) (Gladden Resp. to Interr. 10).[8]

Ogu, meanwhile, testifies only that he did not have permission on his own to view Doe's

protective custody status on JACCS, Dkt. 74 at 12 (Ex. G) (Ogu Dep. 24), and otherwise has no

memory from that night—a fact which cuts neither way, Dkt. 77-9 at 15–16 (Ex. 3) (Ogu Resps.

to Reqs. for Admis. 2–4).  But, as explained above, Doe has pointed to sufficient evidence for a

reasonable jury to find that Defendants in fact understood the risk.  And a jury is, of course,

entitled to disbelieve Defendants' testimony—especially as it relates to their subjective state of

mind.  *See Holmes v. Lincoln Cty.*, No. 01-19-P-H, 2001 WL 1432367, at *4 (D. Me. Nov. 15,

2001) ("[A] mere denial by the prison official involved that he actually drew the inference

---

[8]  Defendants also claim that Gladden "did not know that Plaintiff was transgendered," Dkt. 70 at
20, but fail to support the assertion with a record citation.  In fact, Gladden admitted that he *did*
know, or at least suspected.  *See* Dkt. 77-9 at 8–9 (Ex. 2) (Gladden Resp. to RFA 6).

required by *Farmer* is not enough to entitle him to summary judgment. . . . [A]t the very least

[his] credibility must be evaluated . . . ."); *Fether v. Frederick Cty.*, No. CIV. CCB-12-1674,

2015 WL 507817, at *9 (D. Md. Feb. 6, 2015) ("The deputies deny having actually made such an

inference.  But a reasonable factfinder could reach the opposite conclusion.").

Defendants assert in their reply brief that the only relevant inquiry is "whether either

Defendant knew that Johnson was a possible predator."  *See* Dkt. 86-1 at 10, 18–24.  This is

incorrect.  "Just because it is possible to state a claim on the basis of a guard's knowledge that a

particular inmate poses a heightened risk of assault to the plaintiff does not mean that this is the

only way to state a claim.  Sometimes the heightened risk of which the guards were aware comes

about because of their knowledge of the victim's characteristics, not the assailant's."  *Weiss v.

Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000) (citations omitted).  Doe, at minimum, has followed

this latter course.  As explained above, she has identified evidence showing Gladden and Ogu's

knowledge of her transgender appearance, knowledge of her "house alone" status, and

knowledge of their own flagging security practices.  From these, a reasonable jury could find that

Gladden and Ogu knew they were placing Doe at substantial risk of sexual assault.

      b.  <u>Disregard of Risk</u>

A finding of "deliberate indifference" requires not only that officials knew of a risk to

inmate safety, but that they also disregarded it.  Thus, even if prison officials have actual

knowledge of a risk to prisoner safety, they do not violate the Eighth Amendment if they respond

reasonably to that risk.  *Farmer*, 511 U.S. at 844; *Giroux*, 178 F.3d at 33.   Defendants properly

state this rule, *see* Dkt. 70 at 21–22, but provide no analysis and identify no facts suggesting why

they might fall within it.  As a result, Defendants have not properly raised this argument.  *See

Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001) (per curiam) ("A

litigant does not properly raise an issue by addressing it in a 'cursory fashion' with only 'bare-bones arguments.'" (quoting *Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997))).

Doe, in contrast, points to evidence that would allow a reasonable jury to find that Gladden and Ogu failed to take advantage of options far more reasonable than double-celling Johnson with Doe.  *See* Dkt. 77 at 42.  She argues, for example, that neither Gladden nor Ogu have supplied any reason why Johnson needed to be transferred into Doe's cell at all.  Dkt. 77 at 30–31.  Defendants could have left Johnson in his original cell, and thereby avoided creating the risk in the first place.  Or they could have placed him in any number of apparently empty cells or the temporary "holding cage."  *See* Dkt. 76-1 at 65–66 (Ex. 14); Dkt. 77-7 at 39–40 (Reid Dep. 55–56).  And, according to Doe, they could have at least reduced the risk of rape by performing periodic security checks.  Dkt. 77 at 42; *see supra* Part I.D.1.

As a result, the Court concludes that a reasonable jury could find that Gladden and Ogu acted with deliberate indifference, and thereby violated the Eighth Amendment, when they left Johnson in Doe's cell unsupervised overnight.

## B.      Clearly Established Law

Having determined that a reasonable jury could find that Gladden and Ogu acted with "deliberate indifference" by putting Doe at risk of rape at the hands of her fellow inmate, the Court must next consider whether that conduct violated a right that was "clearly established" at the time.  *See Ashcroft*, 563 U.S. at 735.  This question is "conceptually distinct" from questions of the sufficiency of the evidence.  *Johnson v. Jones*, 515 U.S. 304, 313–14 (1995).  For purposes of answering it, therefore, the Court will assume the truth of Doe's version of the

facts—described above—which the Court deems to be "adequately supported" such that a

reasonable jury could find them.  *See Behrens v. Pelletier*, 516 U.S. 299, 313 (1996).

Defendants argue that "there was no violation of . . . any clearly defined right implicating

the Eight Amendment's prohibition against cruel and unusual punishment."  Dkt. 70 at 23.

Assuming that Doe's version of the facts is correct, that contention is frivolous.  The Supreme

Court held unequivocally in *Farmer* that "prison officials may be held liable under the Eighth

Amendment for the rape of a transgender inmate by another inmate if the officials knew that the

victim faced a substantial risk of serious harm and they disregarded that risk by failing to take

reasonable measures to abate it."  *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000)

(describing the holding of *Farmer*, 511 U.S. at 847).  It is difficult to imagine a clearly

established rule that is more on point than that.  And this right was clearly established, moreover,

well before July 2012:

> In the simplest and most absolute of terms, the Eighth Amendment right of
> prisoners to be free from sexual abuse was unquestionably clearly established prior
> to [September 1994], and no reasonable prison guard could possibly have believed
> otherwise.

*Id.*; *accord, e.g.*, *Howard*, 534 F.3d at 1242 ("The Supreme Court and the Tenth Circuit have

repeatedly and unequivocally established an inmate's Eighth Amendment right to be protected

from substantial risks of sexual assault by fellow prisoners."); *Kahle v. Leonard*, 477 F.3d 544,

553 (8th Cir. 2007) ("It has long been established in this Circuit and elsewhere that '[a] prison

official may be held liable under the Eighth Amendment if he or she knows that an inmate faces

a substantial risk of serious harm and disregards that risk by failing to take reasonable measures

to abate it.' (citation omitted)); *Velez v. Johnson*, 395 F.3d 732, 736 (7th Cir. 2005) ("Although

[the parties] disagree over how the constitutional right at issue here should be characterized, we

believe it is plainly the right to be free from deliberate indifference to rape and assault.  There

can be no debate that this right was clearly established [in 1994].”); *Estate of Gaither v. District of Columbia*, 833 F. Supp. 2d 110, 118 (D.D.C. 2011) (“It is well-established that ‘prison officials have a duty to protect prisoners from violence at the hand of other prisoners.’”) (quoting *Farmer*, 511 U.S. at 833).

None of this is to say that Gladden and Ogu are necessarily liable under § 1983.  The jury may or may not find the factual predicates to Doe’s Eighth Amendment claims.  But, on the present record, and resolving all disputed factual issues in Doe’s favor, qualified immunity is unavailable.

## CONCLUSION

Defendants’ motion for partial summary judgment, Dkt. 70, is hereby **GRANTED** as unopposed with respect to Rhyne, Adjanla, Pope, and Holbrook, and **DENIED** with respect to Gladden and Ogu.

**SO ORDERED**.


 /s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  October 18, 2016